UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x

UNITED STATES OF AMERICA,

v.

KIMBERLY OSORIO,

Defendant.

---------------------------------------------------x

**MEMORANDUM AND ORDER**
25-CR-182 (RPK)

RACHEL P. KOVNER, United States District Judge:

Kimberly Osorio is charged with concealment of evidence, obstruction of justice, and making false statements to federal officers in connection with a federal investigation into a conspiracy to divert money from a non-profit organization. Osorio moves to suppress statements she made to federal officers, as well as the fruits of the government's warrant-based search of her home. For the reasons set forth below, the motion is denied.

## BACKGROUND

In 2025, a grand jury in this district charged Lori Zeno and Rashad Ruhani with wire fraud and other crimes. The indictment alleged that Zeno and Ruhani diverted funds from the non-profit organization at which they worked and used them to purchase luxury goods and fund other personal expenses. The government later obtained a complaint, and then an indictment, charging Osorio with committing various offenses to impede the investigation of Ruhani. *See* Complaint (Dkt. #1); Indictment (Dkt. #31). The operative indictment alleges that Osorio engaged in unlawful concealment of evidence and obstruction of justice by hiding Ruhani's cell phone when agents attempted to obtain it, in violation of 18 U.S.C. § 1519 and 18 U.S.C. § 1512(c)(2), and that Osorio made false statements to law enforcement agents related to Ruhani's cell phone and its

whereabouts on June 10, 2025 and June 11, 2025, in violation of 18 U.S.C. § 1001(a)(2). Indictment ¶¶ 27–34. Osorio has moved to suppress her June 10 and June 11 statements to law enforcement agents, and to suppress evidence obtained from her home pursuant to a search warrant.

The material facts relevant to the statements and the searches, which are not in dispute, are described below. These facts are taken from the following materials that Osorio submits in support of her motion: a sworn affidavit submitted by an FBI agent in support of the search warrant pertaining to Osorio's person, home and car (hereinafter the "SW Aff."), the search warrant, call recordings, as well as a video recording of Osorio's June 11 encounter with law enforcement agents and a transcript thereof.

## I. Osorio's Encounters With Law Enforcement Agents

### A. June 10

On June 10, 2025, Ruhani and Osorio took a JetBlue flight from Los Angeles, California, to John F. Kennedy International Airport ("JFK") in New York. SW Aff. ¶ 18 (Dkt. #58-1). Surveillance photos showed Ruhani holding a phone and sitting by Osorio at the gate area in Los Angeles before boarding. *Ibid.*

While Ruhani and Osorio were in the air, the government executed a search warrant authorizing the seizure of electronic devices belonging to two of Ruhani's associates, whom the government refers to as Individual-1 and Individual-2. After those seizures but during the flight, Ruhani's phone received a call from a number associated with Individual-1, and was then used to make a roughly five-minute call to a number associated with Individual-2. *Id.* ¶ 19.

The agents' search warrant also authorized them to seize electronic devices from Ruhani, which they attempted to do after Ruhani landed at JFK. After the plane landed, cell-site location information indicated that Ruhani's cell phone was "powered on and located in the vicinity of

JFK." *Id.* ¶ 20. The phone "then ceased emitting location information," which officers took to mean it "had been powered off." *Ibid.* Ruhani disembarked from the plane separately from Osorio. When federal agents searched him, they did not find any electronic devices on his person. *Id.* ¶ 21.

After learning that Ruhani did not have any electronic devices on his person, law enforcement officers approached Osorio on the airport concourse. *Id.* ¶¶ 21–22. Osorio used her cell phone to videorecord the encounter, and she attaches the recording to her suppression motion. *See* Ex. 2 ("Video"). The recording shows FBI Special Agent Jason Moritz speaking with Osorio for approximately three minutes. The agent stands in front of Osorio on a wide concourse, while another agent, identified in the video as Task Force Officer Michael O'Brien, stands what appears to be about six feet away, behind Osorio and to her right. Video 1:35–1:45. Numerous passengers can be seen walking by Osorio and the agents during the encounter. Both officers wear plainclothes, and neither displays a weapon or makes physical contact with Osorio during the video.

At the beginning of the video, Moritz identifies himself to Osorio and states that he had "reason to believe that [Osorio had] been traveling with somebody else from the plane that [she] just came off of," and that he wants to "warn [Osorio] that lying to a federal agent is a crime." Ex. 3 at 1 ("Video Transcript") (Dkt. #58-2). Osorio responds that she "wants to warn [Moritz] that [she] is not having any conversation without an attorney present." *Ibid.* Moritz says he "understand[s] that," warns Osorio again that "lying to a federal agent is a crime," and tells Osorio that if she "were given any electronic devices, [she] could be committing obstruction of justice[, w]hich is another federal crime." *Ibid.* After Osorio interrupts to ask Agent Moritz to show his badge and he does so, the agent asks Osorio if she is "traveling with anybody else." *Id.* at 2; Video 0:30–0:35. Osorio reiterates that she will not answer questions without an attorney, to which

Moritz responds "okay," after which Osorio states that she is "on [her] way home" and that she "does not know what this is about." Video Transcript 1–2. Moritz again states that he believed Osorio "may be holding electronic devices that [we]re not [he]r own," and asked if she understands. *Id.* at 2. Osorio asks if Moritz has "a warrant or anything," to which Moritz responds that he has a search warrant for the electronic devices of the person she was travelling with, adding again that he believes she has those devices on her person. Osorio responds that she did "not have any devices on [her] person that do not belong to [her]." *Id.* at 3.

Moritz says "Okay, thank you very much" and that he is "going to ask [her] to wait here momentarily." Osorio says "no," adding that Moritz is "holding [her] against [her] will," and that she is going home. *Ibid.* Moritz states that he is not holding Osorio against her will, and that he "wants to warn [her] again" that if she is "holding electric devices that [we]re not [he]rs," then she would be "committing obstruction of justice." *Id.* at 3–4. He asserts that he is "giving [her] an opportunity." *Id.* at 4. Osorio reiterates that she is not having any conversations without her attorney present, and that she is going home, to which Moritz says "Okay." After a pause, Osorio states, "excuse me," and Moritz steps aside. *Ibid.*; Video at 2:50–2:55. The video then shows Osorio walking through the concourse.

**B. June 11**

The next day, Osorio attended Ruhani's arraignment in this district on charges stemming from the fraud against the nonprofit organization. SW Aff. ¶ 24. The encounter is described in abbreviated form in the affidavit submitted in support of the search warrant for Osorio's home, which states that before Ruhani's arraignment on that date, Osorio "engaged in a voluntary interview" with law enforcement personnel, including an FBI Special Agent, at the courthouse. *Ibid.* It states that during the interview, Osorio acknowledged that she had traveled to New York with Ruhani but stated that she did not take his phone or know its whereabouts. *Ibid.*

## II. Search Warrant for Osorio's Home

Two weeks after the arraignment, on June 25, 2025, an FBI agent obtained a warrant authorizing a search of Osorio's home, from which evidence was subsequently recovered, as well as Osorio's person and vehicle, from which the government made no seizures. The warrant authorizes agents to seize from Osorio's home "all electronic devices." Warrant 55 (Dkt. #58-1). It further specifies that the property to be seized under the warrant is "[a]ll records relating to violations of Title 18, United States Code, Sections 371 (conspiracy), 1001 (false statements to law enforcement), and 1512(c)(1) (obstruction of justice) . . . from June 10, 2025, through" June 25, the date the warrant was issued. *Id.* at 56. The warrant states that this includes 11 categories of evidence, such as "[i]nformation relating to attempts to alter, destroy, mutilate, or conceal any electronic devices," recordings of "Osorio and law enforcement agents" at JFK, records "associated with Ruhani" in connection with the charged offenses, "Internet or search history relating to" the charged offenses, "[r]ecords of financial transactions relating to" the offenses; and records of meetings related to the charged offenses or other information regarding "methods of communication" used by Osorio, Ruhani, or co-conspirators. *Id.* at 45–47, 50–52, 56–58.

The affidavit submitted in support of the application summarizes the June 10 and June 11 encounters above, noting that Osorio videotaped the June 10 encounter on her cell phone. It also describes phone calls between Ruhani and Osorio after Ruhani's arrest. According to the affidavit, Ruhani called Osorio on June 12, 2025, from the Metropolitan Detention Center ("MDC"), where he was being held. In the June call, Ruhani told Osorio to "go to the phone that you have," and call an individual whose contact was stored on it. SW Aff. ¶ 26. In a second call on June 15, Ruhani told Osorio he "text[ed]" her, even though he "could not have sent a text . . . without possessing a contraband" phone. *Id.* ¶ 29.

The search warrant affidavit describes an additional call between Ruhani and Osorio that occurred on June 18. This time, Ruhani did not use the inmate code assigned to him by the MDC to make the call, but instead used another inmate's phone code. And instead of contacting Osorio on the number he had registered on his call list with the MDC, Ruhani called a different number associated with Osorio. *Id.* ¶¶ 30–31. The affidavit states that "Osorio told Ruhani that, 'when I left that night,' she had met with another associate of Ruhani and that 'he took one of your, and I took one,' without finishing the sentence for what specifically was taken. She also stated that 'he didn't know I had the other one. He wanted all of your stuff.'" *Id.* ¶ 31. The agent states that he believes Osorio was discussing Ruhani's cell phones. *Ibid.*

Osorio attaches the entire recording of the call to her motion to suppress, which includes additional statements the affiant did not mention. After describing the associate as wanting Ruhani's "stuff," Osorio said in the recorded call: "I said I'm not going to argue with you. I didn't want to be put in that position, so he took a chain and a watch . . . . It was just like a weird position, just the way it happened." Ex. 5 ("June 18 Recording") 4:30–5:05. Ruhani then asked whether the associate "took the yellow one or the white one." *Id.* at 6:04–07. Osorio replied "yellow." *Ibid.*

A magistrate judge granted the warrant application, and the government executed the warrant. The government seized evidence pursuant to the warrant from Osorio's home, including cell phones and other electronic devices, but did not seize evidence from her person or vehicle. Def.'s Mot. to Suppress 8 (Dkt. #58) ("Mot. to Suppress"); Gov't Mem. in Opp. 11–12 (Dkt. #66) ("Opp. Br.").

## DISCUSSION

Osorio moves to suppress on several grounds. She argues that her statements on June 10 should be suppressed because agents conducted a custodial interrogation without providing *Miranda* warnings or, in the alternative, because the stop on the concourse was a detention that violated the Fourth Amendment. She argues that her statements to agents on June 11 should be suppressed on the theory that agents were not permitted to reinitiate questioning on that date because she had invoked her right to counsel on June 10. In addition, she moves to suppress the evidence seized from her home, asserting that the warrant affidavit was flawed because it omitted material information, and that the warrant is so deficient that the officers cannot claim good-faith reliance. For the reasons explained below, Osorio's motion is denied without the need for an evidentiary hearing.

### I. Evidentiary Hearing

As a preliminary matter, no hearing is required to resolve these claims because the material facts are not in dispute.

In her opening brief, Osorio suggests that an evidentiary hearing is warranted on one issue only—whether the magistrate judge who issued a search warrant for Osorio's home, car, and person abandoned her judicial role in issuing the warrant. Osorio suggests a hearing should be held to ascertain what statements, if any, law enforcement agents made to the judge before the warrant was issued. But an evidentiary hearing to explore that theory is utterly unwarranted because—as Osorio herself acknowledges—she has no evidence suggesting that the judge who issued a warrant related to this case abandoned her judicial role in doing so.

In her reply brief, Osorio makes the alternative claim that an evidentiary hearing should be held because she "vehemently disagrees with the government's claim" in its opposition brief "that its agents warned her prior to initiating" the interview on June 11 "that she was reinitiating the

interrogation that occurred the day prior." Def.'s Reply Br. 14 (Dkt. #69) ("Reply Br."). But the government's brief, fairly read, does not claim that agents made that statement in the first place. Rather, the government's brief appears simply to describe Osorio's conduct in agreeing to a suretor interview as "reinitiating contact with the government." Opp. Br. 24 ("The defendant was told that the government, including the FBI, would ask her questions to assess her suitability as a suretor in Ruhani's criminal case, and her agreement to answer these questions was a knowing reinitiation of a conversation that evinced her willingness and desire to speak to the government."). Accordingly, there is no factual dispute requiring a hearing about whether agents warned Osorio on June 11 "that she was reinitiating the interrogation that occurred the day prior." Reply Br. 14. In any event, the disposition of Osorio's legal claims does not turn on whether such a warning occurred—or whether it was Osorio or the government that reinitiated contact on June 11—because, as explained below, the government was free to reinitiate contact with Osorio on June 11.

## II. June 10 Statements

Osorio is not entitled to the suppression of her statements to law enforcement officers on June 10. Contrary to her arguments, law enforcement officers did not seize Osorio or subject her to a custodial interrogation when they confronted her on the concourse at JFK Airport.

Both of Osorio's arguments regarding the June 10 seizure depend on Osorio having been seized by law enforcement agents. She first invokes the Fourth Amendment's prohibition on unreasonable seizures. A seizure occurs only if government agents use physical force or—as relevant here—if a person "submi[ts] to [an] assertion of authority." *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (emphases omitted). An assertion of authority requires that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). However, officers may approach someone in a public space and "pose questions, ask for identification, and request

consent to search" their effects so long as they do not "induce cooperation by coercive means." *United States v. Drayton*, 536 U.S. 194, 201 (2002). The line between a coercive and a non-coercive encounter turns on whether a person may "disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citation omitted).

Osorio also invokes the requirements of *Miranda v. Arizona.* As a "prophylactic" measure to safeguard the Fifth Amendment rights against self-incrimination, the Supreme Court has required *Miranda* warnings when "suspects who are in custody are interrogated" by law enforcement officers. *Vega v. Tekoh*, 597 U.S. 134, 141 (2022) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). The "in custody" test targets a subset of seizures—only those that a reasonable person would have perceived to involve "restraints comparable to those associated with a formal arrest." *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (quoting *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009)); *see Berkemer v. McCarty*, 468 U.S. 420, 422 (1984). Thus, "[t]he free-to-leave inquiry" used to ascertain whether a seizure has occurred is "a necessary, but not determinative, first step in establishing *Miranda* custody." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004).

The Second Circuit finds the following factors probative in the free-to-leave inquiry:

> the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990). In *Mendenhall*, two agents approached an individual on an airport concourse, identified themselves as federal agents, and asked for her identification and ticket. 446 U.S. at 547–48. The Supreme Court held that the approach was not a seizure. Because the officers approached the suspect "in a public concourse," "wore no uniforms and displayed no weapons," and "requested, but did not demand" her identification, their actions

did not amount to a seizure. *Id.* at 555. By contrast, in *Florida v. Royer*, 460 U.S. 491 (1983), the Court found a seizure had occurred during a more coercive airport stop. There, two agents approached a suspect in an airport concourse and asked him for his ticket and license. *Id.* at 494 (plurality opinion). The Court concluded that the officers seized the suspect when, after examining his ticket, they identified themselves as narcotics agents, "told [him] that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart." *Id.* at 501 (plurality opinion).

Osorio's Fourth Amendment and *Miranda*-based challenges fail because the *Lee* factors indicate that the officers did not seize Osorio on the airport concourse. Like the officers in *Mendenhall*, Moritz and O'Brien approached Osorio for about three minutes on a public concourse. The two agents did not display firearms, wear uniforms, touch Osorio, or retain her personal effects. *See Lee*, 916 F.2d at 819. Unlike in *Royer*, they did not ask her to accompany them to a private room or take her identification.

Osorio argues that Moritz's statements nevertheless transformed the encounter into a seizure, but those statements, on the whole, did not convey that Osorio was required to remain with the officers or answer questions. To be sure, Moritz continued speaking to Osorio even after she said she would not answer questions without her attorney present. But Moritz did not suggest she had to answer questions or to stay with the officers. Instead, when she said she would not answer questions without an attorney, he told her "I understand that" and "okay," Video Transcript 1–2, before going on to warn Osorio that she could be committing a crime by holding Ruhani's electronic devices. Other statements during the encounter also conveyed that Osorio was free to leave: when Moritz sought to have Osorio stay on the concourse after she denied carrying

electronic devices for someone else, he phrased his statement as a request—"ask[ing] [her] to wait here momentarily"—rather than a command. *Id.* at 3. And when Osorio refused and suggested that he was "holding [her] against [her] will," he stated that he was not, thereby making clear that she was free to leave. *Ibid.* Finally, when Osorio told Moritz that she was going home, and then said "excuse me," the agent stepped to the side. Video at 2:50; *see Drayton*, 536 U.S. at 204 (no seizure when officer "left [an] aisle free so that [defendants] could exit"). Taken as a whole, the officer's statements did not "transform[] an otherwise consensual encounter into" a nonconsensual one. *Lee*, 916 F.2d at 819.

Osorio suggests that the agents having "positioned themselves directly in front of and behind [her] so she could not walk away" weighs in favor of finding the encounter to be a seizure, invoking *United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016). Mot. to Suppress 16–17. But Osorio overstates the extent to which the agents restrained her movement. While Moritz is shown on the video standing in front of Osorio, O'Brien stands approximately six feet away on the wide concourse, with ample space to the side of Moritz where Osorio could have passed. And even if Osorio were correct that her passage was physically blocked, the case is a far cry from *McDow*, in which officers not only stood directly beside a suspect to "block[] [him] from leaving," but also frisked him and directed him to return when he tried to leave. 206 F. Supp. 3d at 845–46. In cases more closely resembling this one, the Second Circuit has consistently found that no seizure occurred. *See United States v. Thompson*, 941 F.2d 66, 70 (2d Cir. 1991) (no seizure when one officer approached defendant while the other remained behind her); *Pinto-Montoya v. Mukasey*, 540 F.3d 126, 132 (2d Cir. 2008) (per curiam) (no seizure when officials "block[ed]" jetway and approached individual given non-coercive nature of encounter).

In sum, a reasonable person in Osorio's position would have believed she was "free to end the conversation," *Mendenhall*, 446 U.S. at 555—as Osorio actually did. Osorio is therefore not entitled to the suppression of her June 10 statements.

**III. June 11 Statements**

Osorio's motion is also denied insofar as it seeks to suppress her statements on June 11. Because Osorio was never in custody on June 10, questioning by a law enforcement agent on June 11 did not constitute an impermissible reinitiation of questioning after an invocation of *Miranda* rights.

Osorio's argument for suppression of the June 11 statements depends on the requirements established in *Edwards v. Arizona*, 451 U.S. 477 (1981). *Edwards* held that when an individual invokes her right to have "counsel present during custodial interrogation," the accused "is not subject to further interrogation by the authorities until counsel has been made available," or the accused initiates further communication. *Id.* at 484–85. But while a person who has not been taken into custody is free to refrain from talking to law enforcement officers, she cannot invoke her right to counsel under *Miranda*. *United States v. Mastroianni*, No. 20-CR-575 (PMH), 2022 WL 17404783, at *6 (S.D.N.Y. Dec. 2, 2022) (collecting cases); *see McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (noting that Supreme Court has "never held that a person can invoke his *Miranda* rights . . . in a context other than 'custodial interrogation'"). Because the officers did not place Osorio in custody on June 10, her statements about a lawyer did not constitute an invocation of the right to counsel under *Miranda*. As a result, the officers' questions to her on June 11 were not an impermissible reinitiation of interrogation under *Edwards*.

Osorio does not develop any argument that her June 11 encounter with government agents was itself a custodial interrogation that demanded a separate *Miranda* warning. While she states in passing in the introductory section of her suppression motion that she was "seized" by agents

on June 11, Mot. to Suppress 1, she never asserts even perfunctorily that she was in custody—that is, subject to "restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d at 153 (citation omitted). Nor does she develop any argument that a reasonable person in her position on June 11 would have believed that she was not free to leave. In the absence of any meaningful development, any contention that the June 11 encounter was a custodial interrogation is forfeited. *United States v. Stegemann*, 701 F. App'x 35, 38 (2d Cir. 2017) (deeming an argument forfeited when it was "perfunctory" and "undeveloped").

## IV. Warrant-Based Seizures

Osorio is not entitled to suppression of the evidence seized from electronic devices that were taken from her home in a warrant-based search. Osorio's argument that agents omitted material facts from the search warrant lacks merit. And Osorio's remaining arguments fail because the officers who searched her devices were entitled under the good-faith doctrine to rely on a warrant duly issued by a magistrate judge.

### A. Misstatements or Omissions in the Warrant Affidavit

Osorio's motion is denied insofar as it seeks suppression on the ground that the warrant affidavit was marred by misstatements or material omissions. *Franks v. Delaware*, 438 U.S. 154, 171 (1978), established the framework for such claims. To overcome the "presumption of validity" that applies to "the affidavit supporting the search warrant," *United States v. Lauria*, 70 F.4th 106, 124 (2d Cir. 2023) (quoting *Franks*, 438 U.S. at 171), the defendant "must satisfy both a state of mind requirement and a materiality requirement" with respect to any inaccuracies or omissions, *id.* at 125. In particular, she must show "that '(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding.'" *Ibid.* (quoting *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir. 2000)). If the alleged

misstatement is material, and if the defendant makes "a substantial preliminary showing that" it "was included by the affiant in the warrant affidavit" "knowingly and intentionally, or with reckless disregard for the truth," then the court must hold a *Franks* hearing, at which the defendant bears the burden of establishing perjury or reckless disregard for the truth by a preponderance of the evidence. *Id.* at 124 (quoting *Franks*, 438 U.S. at 155–56). Osorio has not established an entitlement to a *Franks* hearing.

Osorio first faults the affidavit for stating that Osorio spoke to agents voluntarily on June 10 and June 11, and omitting details surrounding Osorio's conversations with agents that Osorio suggests would have alerted the magistrate judge to violations of *Miranda*, *Edwards*, and the Fourth Amendment. Osorio has not made any showing of a misrepresentation or material omission because as explained above, agents did not seize Osorio at the airport on June 10, nor did they violate her rights under *Miranda* or *Edwards*. Accordingly, the portions of the affidavit describing the June 10 and June 11 encounters did not contain misstatements or material omissions.

Osorio fares no better in her argument that the warrant affidavit was defective because its description of a June 18 phone call between Osorio and Ruhani omitted context that undercuts probable cause. In the portion of the call that the affidavit describes, Osorio recounts how after she left Ruhani on "that night," another individual "took one of your, and I took one"—without finishing her sentence. SW Aff. ¶ 31. In the affidavit, the agent states that he believes Osorio was discussing one of Ruhani's cell phones. *Ibid.* Osorio faults the affidavit for failing to mention that, later in the call, Osorio described the items the individual had taken as "a chain and a watch," June 18 Recording 4:30–5:05, and that in response to Ruhani's query about whether the associate "took the yellow one or the white one," Osorio states "yellow," *id.* at 6:04–07.

But even were these additional details about the June 18 call included, the warrant affidavit would establish probable cause that Osorio had taken possession of one or more of Ruhani's electronic devices to prevent their being seized by law enforcement agents. That conclusion has strong support in the warrant affidavit without the June 18 phone call. The affidavit recounted how Ruhani and Osorio were traveling together on June 10; Ruhani had his phone before he and Osorio boarded a plane; Ruhani apparently learned that several associates' phones had been seized when he was on the plane; Ruhani's phone appeared to be at JFK after the plane landed but was then powered off; and Ruhani no longer had any electronic devices when agents stopped him upon disembarking. These facts support an inference that Osorio—Ruhani's traveling companion—took possession of a phone and any other electronic devices in Ruhani's possession. That conclusion is reinforced by the affidavit's description of a June 12 recorded call in which Ruhani directs Osorio to "go to the phone that you have" and call an individual whose number was stored there. SW Aff. ¶ 26. And it finds additional support in the June 18 call—even with the additional context Osorio provides. Ruhani made that call to Osorio using another inmate's identification code, and he called a number for Osorio that was not the one he had registered on his call list with the MDC, suggesting that the call's true subjects were items that Ruhani did not want authorities to hear him discussing with Osorio—even if Osorio used innocuous terms to refer to those items during the recorded call. In sum, the omission of additional details from the June 18 call does not vitiate the showing of probable cause in the search warrant affidavit.

**B. Other Challenges to the Warrant Affidavit**

The good-faith doctrine defeats Osorio's remaining challenges to the warrant affidavit. "The animating principle behind the good-faith exception is that the exclusionary rule aims to 'deter police misconduct rather than to punish the errors of judges and magistrates.'" *United States*

*v. Silva*, 146 F.4th 183, 193 (2d Cir. 2025) (quoting *United States v. Leon*, 468 U.S. 897, 916 (1984)). Thus, "evidence obtained in objectively reasonable reliance" on a warrant will not be suppressed, even if the warrant is "subsequently invalidated." *Leon*, 468 U.S. at 922. "[M]ost searches conducted pursuant to a warrant . . . likely fall within" the good-faith exception to the exclusionary rule. *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011). But "[t]he Supreme Court has identified four circumstances in which we do not accept that the government acted in good faith: '(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'" *Silva*, 146 F.4th at 193 (quoting *Clark*, 638 F.3d at 100). None of these circumstances are present here.

As to the first exception, Osorio suggests that the search-warrant affiant knowingly misled the magistrate judge because he did not provide a more detailed description of the circumstances surrounding Osorio's June 10 and June 11 statements, and because he left out portions of the June 18 call. She invokes a decision finding the good-faith exception unavailable when an affidavit relied on evidence obtained illegally, and the affidavit did not disclose the surrounding facts that would have permitted the magistrate judge to assess legality, *United States v. Reilly*, 76 F.3d 1271, 1280–81 (2d Cir. 1996)—an omission that the court inferred reflected "clear bad faith," *id.* at 1283; *see* Mot. to Suppress 30–32. But there is no basis to infer that the omissions of which Osorio complains misled the magistrate, much less that the affiant did so knowingly, because as explained above, the omitted facts neither undermine the legality of the June 10 and June 11 interviews nor vitiate the probable cause showing in the warrant.

Osorio next argues that the search warrant affidavit "was so bare bones in establishing probable cause to search Ms. Osorio's devices and papers as to render reliance upon it unreasonable." Mot. to Suppress 33. But as explained above, the warrant affidavit established a fair probability that Osorio took possession of Ruhani's electronic devices, including a cell phone, from Ruhani to prevent them from being seized by law enforcement agents, and that Osorio used one or more of her own phones to communicate with Ruhani about that obstruction. The warrant affidavit also set forth facts supporting the inference that Osorio used her own cell phone to film an encounter during which she made false statements—thereby providing evidence of the false-statements charge. Under these circumstances, the application to search electronic devices found in Osorio's home (and on her person or in her vehicle) was not "so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Silva*, 146 F.4th at 193 (citation omitted).

Osorio next suggests that reliance on the warrant was unreasonable because its authorization to search electronic devices was too broad—extending to "the entire contents of all of Ms. Osorio's electronic devices, records, emails, messages, internet search history, and any other item that fell within the warrant's all-encompassing list of items." Mot. to Suppress 26–27. This argument presents a closer question. But a number of decisions have sanctioned warrants to search all electronic devices or all phones at a particular location. *See, e.g.*, *United States v. Thomas*, No. 23-CR-481 (NSR), 2025 WL 1733273, at *1, *4 (S.D.N.Y. June 23, 2025) (warrant to seize any electronic devices in a residence believed to contain evidence of the suspect's offenses based on evidence defendant used "multiple devices including multiple cellphones" to facilitate sex trafficking); *United States v. Coffey*, No. 21-CR-538 (JMA) (ARL), 2023 WL 8891508, at *11 (E.D.N.Y. Dec. 26, 2023) (warrant to seize all electronic devices in a home, given evidence narcotics traffickers frequently used electronic devices); *United States v. Nurse*, No. 24-CR-6054

(EAW), 2025 WL 3033464, at *7 (W.D.N.Y. Oct. 30, 2025) (warrant to seize any cell phones at a particular location).

Courts have similarly declined to require the government to show how each device was used, because a suspect could have used any of her devices to send an email, receive a text, or make a call that evidenced a charged crime. *United States v. Hiya*, No. 24-CR-282 (VM), 2024 WL 5004586, at *3 (S.D.N.Y. Dec. 6, 2024) (probable cause to search five devices owned by defendant given evidence that defendant sent "one email containing false statements"); *United States v. Arias-Casilla*, No. 21-CR-218, 2022 WL 2467781, at *4 (S.D.N.Y. July 6, 2022) (probable cause supported search of multiple cell phones even though affidavit offered evidence that defendant had used only one of the cell phones for criminal activity).

Here, the search affidavit certainly could have been more fulsome in its discussion of the request to search all devices in Osorio's home. But the affidavit notes that agents had authorization to seize all of Ruhani's "electronic devices" on June 10, SW Aff. ¶ 16, and that Ruhani did not have "any . . . electronic device" on his person when he arrived at JFK, leading the agent to believe that Ruhani provided his electronic devices to Osorio prior to exiting the flight," *id.* ¶ 21. And the June 18 call provided evidence that Osorio had taken possession of multiple devices from Ruhani—not just a single cell phone. The affidavit also noted that in the agent's "training and experience . . . individuals engaged in illicit activity often use multiple electronic devices to evade law enforcement detection." *Id.* ¶ 37. Given the cases in this circuit finding warrants for all devices or all phones at a location to be consistent with the Fourth Amendment, and the presence of these supporting facts, the warrant here was not so broad as to render the officers' reliance on it objectively unreasonable.

The cases on which Osorio relies are inapposite. The first involves officers who suspected an individual of storing ammunition in a backpack and sought to search his phone based on the "blanket generalization[]" that people "often use their phones" to take pictures and to communicate. *United States v. Banyan*, 791 F. Supp. 3d 388, 395–96 (S.D.N.Y. 2025). The second involves officers who sought to search a suspect's hard drive for child pornography but did not offer any evidence that the suspect had possessed such material. *United States v. Galpin*, 720 F.3d 436, 448 (2d Cir. 2013). Neither applies here, where the affidavit contains specific details about how Osorio used multiple cell phones during and in connection with the charged offenses—either by recording her conversations with the FBI or in her conversations with Ruhani—and how Osorio apparently took custody of Ruhani's devices to prevent their seizure by law enforcement agents.

The good-faith exception also precludes Osorio's argument that the warrant enumerated overbroad categories of information to be seized. Neither the Supreme Court nor the Second Circuit has categorically barred search warrants that enumerate similarly expansive swaths of data relevant to a criminal offense. *See United States v. Purcell*, 967 F.3d 159, 180–81 (2d Cir. 2020) (warrant for "twenty-four categories of evidence that, together, amount[ed] to virtually all data associated with" Facebook account not overbroad given evidence defendant used account for prostitution enterprise); *United States v. Ulbricht*, 858 F.3d 71, 100–02 (2d Cir. 2017) (warrant for "data associated" with website and "any evidence concerning any illegal activity associated" with it not overbroad given extensive evidence website facilitated criminal activity); *United States v. Shipp*, 392 F. Supp. 3d 300, 310 (E.D.N.Y. 2020) (applying good-faith exception to warrant for "sixteen categories of information associated with" Facebook account that "capture[d] all information" associated with it (citations omitted)). As explained above, the affidavit identified

facts suggesting that Osorio took control of Ruhani's electronic devices, filmed her statements to law enforcement officers, and used an additional phone to talk to Ruhani about a purported plan to conceal evidence pertaining to its conspiracy investigation. Under existing precedent, the warrant was not so barebones as to render reliance on it unreasonable.

**CONCLUSION**

For the foregoing reasons, Kimberly Osorio's suppression motion is denied.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: August 27, 2026
Brooklyn, New York